AO 106 (Rev. 04/10) Application for a Search Warrant

AUTHORIZED AND APPROVED/DATE: _s/Mary E. Walters 4/22/2024_

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. M-24-363-STE |
| a White 2019 Dodge Challenger, Oklahoma tag MCL-420 | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the ____Western____ District of _____Oklahoma_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 846 and 841(a) | Drug Conspiracy |
| 18 U.S.C. § 1956 and/or 1957 | Laundering of Monetary Instruments |

The application is based on these facts:
See attached Affidavit of TFO Anthony Finnegan, DEA

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

TFO Anthony Finnegan, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Apr 22, 2024**

*Judge's signature*

City and state:  Oklahoma City, Oklahoma

Shon T. Erwin, United States Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**In the Matter of the Search of**
**a White 2019 Dodge Challenger,**
**Oklahoma tag MCL-420**

**Case No.** __M-24-363-STE_____

**FILED UNDER SEAL**

### Affidavit in Support of an Application
### Under Rule 41 for a Warrant to Search and Seize

I, Task Force Officer Anthony Finnegan, being first duly sworn under oath,
depose and state:

### Introduction and Agent Background

1.    I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a search warrant to search **a White 2019
Dodge Challenger, Oklahoma tag MCL-420**, as further described in Attachment A,
for evidence, instrumentalities, contraband, and/or fruits of violations of Title 21,
United States Code, Section 846 and 841(a) – Drug Conspiracy and Title 18, United
States Code, Sections 1956 and/or 1957 –Laundering of Monetary Instruments,
which items are more specifically described in Attachment B of this affidavit.

2.    I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and
am authorized to request this search warrant because I am a government agent who
is engaged in enforcing federal criminal laws and I am within the category of officers
authorized by the Attorney General to request such a warrant.

3.    I am presently assigned as a Task Force Officer (TFO) with the DEA Tulsa

Resident Office (TRO) and have been since April 2019. I am also a police officer for

the Tulsa Police Department and have been so for approximately fifteen years. I

have a Bachelor of Science in Business Administration-Management from the

University of Tulsa. During my time as a Narcotics Investigator with the Tulsa

Police Department and as a TFO with the DEA, I have participated in wire and

physical surveillance, surveillance of undercover transactions, the introduction of

undercover agents, the execution of search warrants, debriefings of informants, and

reviews of taped conversations and drug records. During my time as a TFO with the

DEA, I have participated in complex international conspiracy investigations

involving organizations responsible for the unlawful manufacturing, importation,

transportation, and distribution of drugs. I have also investigated corruption and

violent criminal offenses related to the activity of DTOs. I have been involved in

drug trafficking investigations of an international, national, and regional scope.

4.    I have completed the Clandestine Laboratory Basic Safety Certification and

Clandestine Laboratory Site Safety Officer courses. I am certified in the recognition

of the methods of manufacturing methamphetamine and am also certified to

dismantle clandestine laboratories. During this training, your affiant was certified to

recognize the chemicals and equipment needed for the illegal manufacture of

methamphetamine. I am knowledgeable about state and federal drug laws. I have

completed the Drug Enforcement Administration Basic Narcotics Investigator

School. I have attended the Drug Enforcement Administration Task Force Officer

School. I have received formal training in narcotics investigations from the Tulsa Police Academy, as well as informal training received from more experienced officers. I have completed the Indoor Marijuana Grow Investigations School. I have attended the Reid Technique of Interviewing and Interrogation School. I have attended the Operation Jetway Interdiction Course. I have authored both state and federal search warrants and have participated in Title III investigations. I have purchased narcotics in an undercover capacity and participated in controlled deliveries of narcotics. I have interviewed numerous individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics. I have learned of the distribution schemes utilized by individuals involved in drug trafficking organizations. During the course of my training and experience with various defendants, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. Through this training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have participated in numerous complex conspiracy cases prosecuted within the federal justice system. I have trained other narcotics detectives within the Tulsa Police Department's Special Investigations Division.

5.    I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, wiretap intercepts, knowledge obtained from other law enforcement officers, my review of documents

related to this investigation, conversations with others who have personal knowledge

of the events and circumstances described herein, and a review of open-source

information including information available on the Internet. Because this affidavit is

submitted for the limited purpose of establishing probable cause in support of the

application for a search warrant, it does not set forth each and every fact I or others

have learned during the course of this investigation.

6.   Based on my training, experience, and the facts set forth in this affidavit,

there is probable cause to search the vehicle described in Attachment A, for evidence,

instrumentalities, contraband, and/or fruits of violations of Title 21, United States

Code, Section 846 and 841(a) – Drug Conspiracy and Title 18, United States Code,

Sections 1956 and/or 1957 –Laundering of Monetary Instruments, as described in

Attachment B.

## Jurisdiction

7.   "[A] warrant may be issued to search for and seize any property that

constitutes evidence of a criminal offense in violation of the laws of the United

States." 18 U.S.C. § 3103a.

8.   The requested search is related to the following violations of federal law:

   a. 21 U.S.C. §§ 846 and 841(a) – Conspiracy to Distribute and to Possess
        with Intent to Distribute Controlled Substances, and

   b. 18 U.S.C. §§ 1956 and/or 1957 – Laundering of Monetary Instruments

9.   Venue is proper because the person or property described in this affidavit is located within the Western District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Drug Offenses Background

10.   I have had extensive experience in debriefing defendants, co-conspirators, witnesses, and informants who have been involved in unlawful drug trafficking and who have had personal experience involving the techniques and methods by which drug traffickers maintain records to identify and locate other drug conspirators, the amounts of drugs distributed and to whom the drugs are distributed, the moneys owed and paid for drugs, as well as the techniques and methods by which drug traffickers acquire, spend, convert, transport, distribute and conceal the proceeds they derive from unlawful drug trafficking.

11.   My participation in drug trafficking investigations has resulted in both the successful prosecution of numerous individuals and the forfeiture to the United States Government of assets purchased with the proceeds from unlawful drug trafficking, as well as assets used to facilitate said violations. In connection with drug trafficking investigations, I have participated in and/or executed several search and seizure warrants at residences, stash houses used as storage and distribution points for controlled substances, and other locations.

12.   Materials searched for and recovered in those locations have included various controlled substances, including cocaine, methamphetamine, and marijuana; drug paraphernalia such as scales, papers and drug packaging materials; books and records reflecting sales, the transfer or transportation of drugs and amounts of money

owed for drugs; records reflecting the names, addresses, and telephone numbers of co-conspirators; sales receipts and other records reflecting the expenditure of moneys that are the proceeds from unlawful drug distribution; currency and money wrappers; computers and computer discs containing drug ledgers and records, and various valuable assets (i.e., automobiles) purchased with the proceeds of unlawful drug trafficking.

13.    Based on my background, training, and experience, as previously detailed in this affidavit, I know:

a.    Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.    Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.    Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing narcotic activities;

d.    Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase, and transfer of controlled substances;

e.    Drug traffickers keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where drug traffickers have ready access to them, i.e., on their persons, in their vehicles, or in or about their residences or place of business, these documents are often kept in code to secret their meaning from law enforcement;

f.    It is common for drug traffickers to secrete contraband, proceeds of drug sales, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, records or evidence of drug transactions relating to transferring, secreting, or spending of large sums of money made from engaging in narcotic trafficking in secure locations on their persons, within their vehicles, or within or around their residences or businesses for ready access or to conceal them from law enforcement authorities;

g.    When drug traffickers amass proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic

banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations, and business frauds;

h.      Drug traffickers commonly maintain names, addresses, or telephone numbers in books or papers for their associates in the trafficking organization; these books or papers include such items as address books, telephone messages, in and correspondence, etc. Shorthand and/or code names are sometimes used for buyers, co- conspirators, sellers, weights, and other details of the drug traffickers;

i.      Drug traffickers secrete and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences, and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that the courts have recognized that unexplained wealth is probative of crimes motivated by greed, in particular, trafficking in drugs;

j.      The books, records, receipts, notes, ledgers, and other items mentioned above, are commonly maintained where the drug traffickers have ready access to them and are maintained often long periods of time after the actual event reflected in the documents.

k.      Drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product. These traffickers usually maintain these photographs in their possession;

8

l.      Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing narcotics; and these paraphernalia include but are not limited to scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m.      The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, including trafficking in controlled substances;

n.      Dealers in narcotics often keep handguns, ammunition, and other weapons in their residences (including outbuildings), businesses, and automobiles to safeguard supplies of drugs and the fruits of narcotics dealings;

o.      Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement officers and, in so doing, acquire property, services, and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names and that they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses, and automobiles together with evidence of their true identities;

p.      Drug traffickers commonly conduct a significant amount of their business by using telephone systems and normally make frequent calls to conduct, direct, supervise, and coordinate their activities;

Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles.

### Probable Cause

14.   The DEA, the Federal Bureau of Investigations (FBI) and the Tulsa Police Department (TPD) Special Investigations Division (TPD/SID) are investigating Domingo Saucedo who is believed to be the head of the Saucedo drug trafficking organization (the "Saucedo DTO" or "DTO"), for arranging the importation of large shipments of methamphetamine and cocaine from Mexico into the United States. The Saucedo DTO consists of several associates of Saucedo and others, both known and unknown to include Gabriel Urquiza-Urquiza, a/k/a "Gabriel Urquiza-Urquiza." Saucedo lives in Mexico. Some of his known associates such as Gabriel Urquiza are based in the Tulsa, Oklahoma area. Based on previous investigations conducted by DEA, TPD and FBI, investigators know that Saucedo and his associates have been smuggling illegal drugs into the United States for years and are presently capable of importing numerous kilograms of methamphetamine and cocaine on a single occasion.

15.   In October 2022, the FBI initiated an investigation into a drug trafficking organization involved in the distribution of large quantities of methamphetamine in the Tulsa, Oklahoma-based area. During this investigation, the FBI identified Saucedo to be a source of supply for illegal narcotics and that he used telephone number 52-732-103-1127. During the FBI investigation, Saucedo directed money laundering of drug proceeds to take place at 12624 East 19th Street, Tulsa, Oklahoma (Gabriel Urquiza-Urquiza's house).

10

16.   In July 2023, TRO began investigating the Saucedo DTO, including a member responsible for laundering drug proceeds via large bulk currency pickups throughout the United States. Based on his training, experience and knowledge of this investigation, Affiant knows that large-scale drug trafficking organizations, such as the Saucedo DTO, involved in the distribution of large quantities of illegal narcotics often utilize more sophisticated money laundering schemes to move drug proceeds back to the drug trafficking organization in Mexico. The method of utilizing United States banks begins when a member of the organization has obtained a certain quantity of United States currency (USC) that needs to be moved as it is derived from the sales of illegal narcotics by the organization. A broker is then responsible for arranging the exchange from the individual who is in possession of the USC to another individual who is responsible for getting the USC deposited into a bank account in the United States. Ultimately, these drug proceeds are then transferred from the account in which they were deposited to an account that belongs to the organization. Based on my training and experience, and knowledge of this investigation, I know that after the transfer of USC into the organization's account, the money is withdrawn and/or transferred into other account(s) in Mexico belonging to the organization.

17.   During this investigation, a United States District Judge in the Northern District of Oklahoma, signed affidavits and orders authorizing investigators to intercept communications over telephone number 918-948-0749 (Target Telephone #1) and telephone number 918-200-8532 (Target Telephone #2). These interceptions

11

lasted from January 31, 2024 until April 8, 2024. Both of these numbers were used by Gabriel Urquiza-Urquiza.

18.   During the course of interceptions over Target Telephones #1 and #2, investigators have confirmed Hispanic males using telephone number 737-357-5180 (UM5180) and telephone number 619-369-96761 (UM6167) to be facilitators who organize the movement of drug proceeds and the distribution of large quantities of methamphetamine for the DTO.

**Money Deliveries to a Confidential Source**

19.   During this investigation, a Confidential Source (CS)[1] was utilized to make two controlled pickups of USC from Gabriel Urquiza-Urquiza. On July 13, 2023, the CS, at the DEA's direction, met up with Gabriel Urquiza-Urquiza and obtained $80,000. An undercover DEA agent later deposited the money into a bank account. On August 2, 2023, the CS, at the DEA's direction, again met up with Gabriel Urquiza-Urquiza and obtained $60,005. The Undercover DEA agent deposited the money into a bank account.

20.   During the second money delivery, the CS asked to obtain methamphetamine from Urquiza-Urquiza, who replied that he did not want to "step on anyone's toes" and would think about it.

---

[1] CS-1 has been cooperating with members of the TRO for approximately one year. CS-1 is cooperating for the purpose of prosecutorial consideration. No other form of consideration has been offered to CS-1. While working as a confidential source, CS-1 has provided information on three or more occasions that has proven to be reliable. CS-1 is familiar with various drug distribution methods employed by drug trafficking organizations. Additionally, CS-1 is familiar with the different methods of money laundering employed by drug trafficking organizations. The information provided by CS-1 has been corroborated by independent evidence, including surveillance, toll records, court ordered intercepted communications, and the seizure of narcotics. CS-1 has a prior criminal history for possession of controlled substances with intent to distribute and possession of firearm. I believe CS-1 is a reliable and credible confidential source. The information provided by CS-1 to date is reliable.

## Money Deliveries Intercepted Over Wiretaps

### February 13, 2024

*A. Intercepted calls about a money delivery*

21.   On February 13, 2024, investigators intercepted an audio call about the delivery of drug proceeds between Gabriel Urquiza-Urquiza, and UM6761 and between Urquiza-Urquiza and UM5180. During these calls, Urquiza-Urquiza and UM6761 coordinated a money delivery from a money courier to Urquiza-Urquiza at the El Chico restaurant in Tulsa.

22.   Investigators then intercepted an audio call between Urquiza-Urquiza and UM5180, while Urquiza-Urquiza was on the way to meet this courier. UM5180 directed Urquiza-Urquiza to deliver $25,000 U.S. Currency to a female in a gray car and said that the female was on her way to Tulsa to meet with Urquiza-Urquiza. Additionally, UM5180 told Urquiza-Urquiza to save $6,000. Investigators believe Urquiza-Urquiza was to obtain a total of $31,000 U.S. Currency from a female driving a gray car on behalf of UM6761. UM5180 informed Urquiza-Urquiza that "Oso" owes him (UM5180) $100,000 for 26 kilos of methamphetamine and that it has been three weeks and UM5180's boss wants his money. UM5180 said he (UM5180) had sent another 25 kilograms of methamphetamine and the money Urquiza-Urquiza was picking up today was proceeds from those 25 kilograms.

23.   A Tulsa County District Judge had authorized a tracker warrant for a Jeep Commander registered to Urquiza-Urquiza on February 7, 2024. Agents tracked the

14

Jeep Commander to the northeast parking lot of 7100 South and Mingo Road Tulsa, Oklahoma near the Golden Corral.

24.    Investigators intercepted additional calls between Urquiza-Urquiza and UM6761 in which they discussed when the female courier would arrive and Urquiza-Urquiza's location.

*B.  Arrival of Leticia GARCIA-Salazar in the gray Chevrolet Malibu*

25.    About 13 minutes after Urquiza-Urquiza arrived near Golden Corral, a gray Chevrolet Malibu, bearing Oklahoma tag NVE512, arrived and parked near Urquiza-Urquiza's Jeep Commander. A registration check of Oklahoma tag NVE512 revealed the tag is registered to a gray 2018 Chevrolet Malibu to Leticia Garcia-Salazar at 3005 SW 60th Street, Oklahoma City, Oklahoma.

26.    Investigators then observed what appeared to be a money exchange, in which Urquiza-Urquiza got out of his vehicle, walked to the gray Chevrolet Malibu, opened the front passenger's door to the Malibu and leaned into the vehicle. A minute later, Urquiza-, now holding a white plastic bag, shut the front passenger's door to the Malibu. Urquiza-Urquiza then walked back to the white Jeep Commander and got back into it. Both vehicles then departed the location.

*C.  Driver of the gray Chevrolet Malibu traveled to 7215 South 92nd East Avenue, Apartment 2*

27.    At approximately 12:34 p.m., the gray Chevrolet Malibu arrived at the Chardonnay Apartment complex, located at 7215 South 92nd East Avenue and parked near Apartment 2. A short time later, investigators established physical

15

surveillance of 7215 South 92nd East Avenue, Apartment 2 and observed a Hispanic female, wearing a brown hoodie, standing at the Chevrolet Malibu. The Hispanic female then walked to and entered Apartment 2 a short time later.

*D. Call by Urquiza-Urquiza to Daisy Villanueva to arrange meeting with a third-party*

28.   At approximately 12:36 p.m., Urquiza-Urquiza utilizing Target Telephone #1 made an outgoing audio call to a Spanish-speaking female (first labeled as UF3103 and later as Daisy Villanueva) at telephone number 405-493-3103 (Session #62). During this call, Urquiza-Urquiza told Villanueva that Urquiza-Urquiza was told to call her (Villanueva), to give her something. Villanueva said yes, to give her (Villanueva) a chance to call another number and that they (the third-party) were on their way. Urquiza-Urquiza asked if she (Villanueva) knew how long it was going to take to arrive. Villanueva said she (Villanueva) would ask again but she (Villanueva) thought it would be around 30 (possibly minutes) and would send Urquiza-Urquiza a message to let him (Urquiza-Urquiza) know.

29.   At approximately 12:45 p.m., surveillance of the Chevrolet Malibu was terminated. At approximately 12:50 p.m., members of the TRO established physical surveillance in the area of the QuikTrip, located at 9529 East 51st Street. At approximately 12:58 p.m., GPS location data indicated the white Jeep Commander departed the QuikTrip, confirmed via physical surveillance. At approximately 1:01 p.m. GPS location data indicated the white Jeep Commander had arrived back at 4122 South 88th East Avenue.

30.   At approximately 1:42 p.m., an incoming audio call from telephone number 580-277-2622 was attempted to Target Telephone #1, however, the call was not answered.

31.   During this investigation, investigators determined that the service provider for telephone number 580-277-2622 is T-Mobile. Furthermore, investigators issued a subpoena to T-Mobile for subscriber information and phone toll data for telephone number 580-277-2622. The results of the subpoenaed revealed telephone number 580-277-2622 is subscribed to Javier Chacon at 504 NE 19th Street, Moore, Oklahoma 73160. Based on a search of an open-source law enforcement database, investigators discovered that Javier Rodarte is also known as "Javier Rodarte-Chacon," and "Javier Chacon."

32.   At approximately 2:10 p.m., GPS location data indicated the white Jeep Commander departed 4122 South 88th East Avenue.

33.   At approximately 2:13 p.m., Urquiza-Urquiza utilizing Target Telephone #1 made an outgoing audio call to a Spanish-speaking female (first labeled as UF3103 and later identified as Daisy Villanueva) at telephone number 405-493-3103 (Session #64). During this call, Urquiza-Urquiza asked her (Villanueva) if it was a guy (the third party). Villanueva said yes, it was a guy in a white car. Urquiza-Urquiza said he (Urquiza-Urquiza) saw him (the third party) and would go that way.

   *E. Urquiza-Urquiza met with Javier Rodarte (in a **White 2019 Dodge Challenger, Oklahoma tag MCL-420**)*

34.   At approximately 2:13 p.m., GPS location data indicated the white Jeep Commander arrived at the QuikTrip, located at 7950 East 41st Street Tulsa, Oklahoma. This was confirmed by physical surveillance. Investigators conducting surveillance observed the white Jeep Commander park near a **white Dodge Challenger**, bearing Oklahoma tag MCL420. Investigators observed the driver's door of the white Jeep open and the driver exit and walk to the front passenger's door of the **white Dodge Challenger**. A registration check of Oklahoma tag MCL420 revealed the tag is registered to a **white 2019 Dodge Challenger** to Daisy Villanueva at 5746 NW 16th Street, Apartment 3 Oklahoma City, Oklahoma. Investigators conducted a driver's license check for Daisy Villanueva. The search revealed a valid Oklahoma driver's license for Daisy Villanueva with a listed date of birth as 11/10/1990 and an address of 5746 NW 16th Street, Apartment 3 Oklahoma City, Oklahoma 73127.

35.   A short time later, investigators observed the driver enter back into the white Jeep and depart the location. GPS location indicated the white Jeep Commander departed the QuikTrip, which was confirmed via physical surveillance. At the same time, the **white Dodge Challenger** traveled to and parked at the fuel pumps.

36.   At approximately 2:16 p.m., GPS location data indicated the white Jeep Commander arrived back at 4122 South 88th East Avenue.

37.   At approximately 2:17 p.m., a Hispanic male, wearing a black hooded sweatshirt and black pants, walked from the **white Dodge Challenger** and entered

18

the QuikTrip. At approximately 2:22 p.m., the Hispanic male exited the QuikTrip and walked back to the **white Dodge Challenger**. At approximately 2:23 p.m., investigators on surveillance observed the Hispanic male enter the driver's seat of the **Dodge Challenger** and depart the QuikTrip. At approximately 2:40 p.m., surveillance of the **white Dodge Challenger** was maintained until the **Dodge Challenger** continued traveling westbound on I-44 west of the Sapulpa exit.

*F. Identification of Javier Rodarte*

38.   Investigators conducted a search of CashApp for telephone number 580-277-2622 (the number that attempted to contact Urquiza-Urquiza at approximately 1:42 p.m. before the meeting at QuikTrip). This search revealed the name Javier Rodarte to be associated with that CashApp account. Investigators then conducted a search of Javier Rodarte on Facebook which revealed an open and publicly accessible profile for Javier Rodarte with multiple public viewable pictures of a Hispanic male matching the description of the Hispanic male who was driving the **white Dodge Challenger** and met with Urquiza-Urquiza at the QuikTrip.

39.   Based on my training an experience, and knowledge of this investigation, I believe that Javier Rodarte met with Urquiza-Urquiza at which time Rodarte received drug proceeds from Urquiza-Urquiza as was coordinated by other members of the DTO.

*G. Javier Rodarte drove to Oklahoma City*

40.   After surveillance of the **white Dodge Challenger** was terminated west of the Sapulpa exit, members of the TRO contacted members of the Oklahoma City District Office (OCDO) requesting assistance with surveillance of the **white Dodge Challenger** as it entered in the Oklahoma City area. At approximately 3:58 p.m., OCDO TFO Cecil Nave observed the **Dodge Challenger** traveling west on I-44 from exit 146. Surveillance of the **Challenger** continued as it drove to the Oklahoma City metro area utilizing I-35 South, to I-40 West, and exiting onto McArthur Boulevard.

41.   At about 4:30 p.m., SA Zach O'Diam observed the **Challenger** turning right (east) from McArthur Boulevard into the Summer Oaks Apartment complex at 5744 NW 16th Street, Oklahoma City. Prior to turning into the complex, TFO Brad Neff maintained surveillance of 5746 NW 16th Street, Apartment 3. Surveillance of the **Challenger** was lost for a short period of time after it turned into the apartment complex.

42.   At approximately 4:32 p.m., SA O'Diam observed the **Challenger** appearing to adjust its parking, as it parked facing north, along a fence, west of 5746 NW 16th Street, Apartment 3. At about 4:41 PM, SA O'Diam observed Rodarte walking from the **Challenger**, towards Apartment 3. At about 4:42 p.m., TFO Neff observed Rodarte walk to door of Apartment 3, use a key in the door, then looked around. At that time, surveillance of Rodarte was lost for a short period of time.

*H. Javier Rodarte traveled with a female to 504 NE 19th Street in Moore, Oklahoma*

43.   At approximately 4:43 p.m., TFO Neff observed Rodarte emerge from the apartment with a Hispanic female wearing a white hooded sweatshirt. Both Rodarte and female walked towards the **Challenger**. As they did so, the female was carrying a purse and a pink/white duffel bag. At about 4:46 p.m., SA O'Diam observed the female walk towards the driver's side of the **Challenger** while Rodarte got into the front passenger's seat. At approximately 4:47 p.m., SA O'Diam observed the female driving the **Challenger** north toward NE 16th Street with Rodarte in the passenger's seat. As they exited the apartment complex, surveillance continued of the **Challenger**. At about 5:15 p.m., TFO Kevin Morales observed the **Challenger** turning south on Pole Road from NE 27th Street in Moore, Oklahoma. At approximately 5:17 p.m., TFO Morales observed the **Challenger** park illegally in front of 504 NE 19th Street in Moore, Oklahoma, on the south side of the road, facing west.

44.   At about 5:21 p.m., SA Sean Lively drove by the residence and observed a maroon Toyota truck parked in the driveway, along with a Honda, and a black Toyota Corolla. While driving by, SA Lively observed Rodarte putting on a bookbag and a pink baby car seat on the ground with a box or bag inside of the baby seat positioned next to Rodarte. At about 5:32 p.m., TFO Jeff Williams drove by the residence and observed the Camry was bearing Oklahoma tag GCQ273. According to law enforcement indices, OKLP GCQ273 was assigned to a 2015 Toyota Camry

registered to Javier Rodarte of 504 NE 19th Street, Moore, Oklahoma. TFO Williams noted that the **Challenger** was no longer at the residence.

**March 11, 2024**

   *A. The **Dodge Challenger** was driven to Tulsa*

45.   On March 11, 2024, at approximately 8:35 p.m., Acting Group Supervisor (A/GS) Taylor Wilson discovered that the GPS location device installed on the **white 2019 Dodge Challenger, bearing Oklahoma tag MCL420** was traveling eastbound on the turner turnpike near Stroud, Oklahoma. I monitored the GPS location data for the **Dodge Challenger** as it continued eastbound on the turnpike toward Tulsa, Oklahoma. During this investigation, investigators have identified the **white 2019 Dodge Challenger** to be owned and driven by Daisy Villanueva.

46.   At approximately 8:42 p.m., investigators intercepted an incoming audio call from UM6761 at telephone number 609-269-4130 to Urquiza-Urquiza at Target Telephone #1 (Session #239). During this call, UM6761 asked Urquiza-Urquiza to meet at El Chico's (a restaurant) again. Urquiza-Urquiza asked UM6761 to give him 40 minutes. Urquiza-Urquiza said 9:40 p.m. UM6761 asked Urquiza-Urquiza if he (Urquiza-Urquiza) can meet earlier because around that time, they (UM6761 and others) will be meeting other people for the old man and they will be busy. Urquiza-Urquiza said he can see him in a half hour, like at 9:10 p.m. UM6761 said perfect that he (UM6761) will see Urquiza-Urquiza there.

47.  At approximately 8:54 p.m., the GPS location data for the tracking device installed on the white 2006 Jeep Commander, bearing Oklahoma tag IND910, indicated the Jeep had departed 12624 East 19th Street Tulsa, Oklahoma. At approximately 9:00 p.m., A/GS Wilson established physical surveillance near the El Chico, located at 9705 East 71st Street Tulsa, Oklahoma. At approximately 9:04 p.m., Urquiza-Urquiza sent a text message from Target Telephone #1 to telephone number 609-269-4130 in Spanish that read, "Ya estoy aqui", translated meaning: "I am here" (Session #240). At approximately 9:05 p.m., the white Jeep arrived and parked in the parking lot near El Chico. At approximately 9:06 p.m., investigators intercepted an outgoing audio call from URQUIZA at Target Telephone #1 to UM6761 at telephone number 609-269-4130 (Session #241). During this call, Urquiza-Urquiza told UM6761 that he (Urquiza-Urquiza) is there in the white Jeep. UM6761 said the courier would be there in five minutes.

*B. The Chevrolet Malibu is driven to El Chico for a meeting with Urquiza*

48.  At approximately 9:12 p.m. GPS location data for the tracking device installed on the gray 2018 Chevrolet Malibu indicated the Malibu had departed 7215 South 92nd East Avenue Tulsa, Oklahoma. At approximately 9:14 p.m., the Chevrolet Malibu arrived at the El Chico. Once the Malibu turned into the parking lot, the Jeep traveled a short distance through the parking lot with the Malibu and the two vehicles stopped and parked near each other. TFO Pryce observed a male subject, matching the description of Gabriel Urquiza-Urquiza, exited the driver's seat

23

of the Jeep and walked to the Malibu. Urquiza-Urquiza was at the Malibu briefly then walked back to and got into the white Jeep.

*C. Garcia-Salazar drove the Chevrolet Malibu to 7215 South 92nd East Avenue*

49.   At approximately 9:15 p.m., GPS location data in conjunction with physical surveillance indicated the Jeep and the Malibu departed the location. The Malibu traveled across the street (Mingo Road) and into and through parking lot. At approximately 9:18 p.m., GPS location data indicated the Chevrolet Malibu had arrived and parked near 7215 South 92nd East Avenue apartment 2, Tulsa, Oklahoma. The Chevrolet Malibu then traveled to the Chardonnay Apartment Complex, located at 7215 South 92nd East Avenue. TFO Evan Foster then observed Garcia-Salazar get out of the Chevrolet Malibu and enter Apartment 2.

*D. Daisy Villanueva drove the **Dodge Challenger** to 7215 South 92nd East Avenue*

50.   At approximately 9:19 p.m., TFO Evan Foster established physical surveillance of the **white Dodge Challenger**, at the intersection of 71st and Mingo Road. TFO Foster maintained visual surveillance of the **Challenger** as it traveled, arrived and parked at the Chardonnay Apartment Complex. At approximately 9:22 p.m., it parked in front of 7215 South 92nd East Avenue, Apartment 2. This was also indicated by GPS location data for the white **Dodge Challenger**. At that time, additional investigators established physical surveillance of 7215 South 92nd East Avenue, Apartment 2, Tulsa, Oklahoma.

### E. Garcia-Salazar and Villanueva unload the **Dodge Challenger**

51.  At approximately 9:37 p.m., TFO Foster observed a female in black clothing (later identified as Daisy Villanueva[2]) and another female wearing a tan shirt and black pants, identified as Leticia Garcia-Salazar[3] exit Apartment 2 and walk to the **Dodge Challenger**. TFO Foster observed both females load up a wagon from the passenger's side of the **white Dodge Challenger** and pull the wagon into Apartment 2.

52.  At approximately 9:59 p.m., TFO Foster observed Villanueva and Garcia-Salazar exit Apartment 2 with the wagon and again load items from the trunk of the **white Dodge Challenger** into the wagon. TFO Foster observed that while removing the items from the trunk, Villanueva and Garcia-Salazar used what appeared to be a blanket to cover up the items as they were placed into the wagon. Villanueva and Garcia-Salazar then walked the wagon into Apartment 2.

---

[2] On March 12, 2024, at approximately 2:12 a.m., the GPS location data for the **white Dodge Challenger** indicated the **Challenger** stopped at the OnCue convenience store, located at 1001 North Portland Avenue Oklahoma City, Oklahoma. At approximately 2:15 a.m., GPS location data indicated the **Challenger** departed the OnCue. Members of DEA Oklahoma City were able to obtain video surveillance from the OnCue for March 12, 2024, from approximately 2:12 a.m. to 2:15 a.m. After viewing the video, members of DEA Oklahoma City confirmed the driver of the **white Dodge Challenger** to match the description of Daisy Villanueva, when compared to a driver's license photo of Villanueva.

[3] The female wearing a tan shirt and black pants matched the description of Leticia Garcia-Salazar based on an Oklahoma driver's license photo investigators obtained for Garcia-Salazar and QuikTrip surveillance of Garcia-Salazar previously obtained during this investigation.

53.   At approximately 11:26 p.m., TFO Foster observed Garcia-Salazar exit Apartment 2 and access the trunk. TFO Foster observed Garcia-Salazar remove two large bags that appeared to be full and walk to and enter Apartment 2 with the bags. At approximately 11:46 p.m., TFO Foster observed Villanueva enter the driver's seat of the **Dodge Challenger** and depart the location, confirmed by GPS location data for the white **Dodge Challenger**. At that time, surveillance was terminated.

### Seizure of 32 Kilograms of Methamphetamine

54.   On March 12, 2024, at approximately 2:04 p.m., members of the TRO observed via electronic surveillance, a female matching the description of Leticia Garcia-Salazar exit the front entry door to 7215 South 92nd East Avenue, Apartment 2 Tulsa, Oklahoma with a large gray plastic tote. Garcia-Salazar had to physically drag the tote through the front door of the apartment. Leticia Garcia-Salazar dragged and then pushed the gray tote to the parking lot and the rear of the gray 2018, Chevrolet Malibu, bearing Oklahoma tag NVE512. Garcia-Salazar placed the tote in the trunk of the Chevrolet Malibu and closed the trunk lid.

55.   At approximately 2:06 p.m., GPS location data for the tracking device installed on the Chevrolet Malibu indicated the Chevrolet Malibu departed the location. I monitored the GPS location data for the Chevrolet Malibu once it departed. At approximately 2:13 p.m., GPS location data indicated the Chevrolet Malibu, driven by Garcia-Salazar arrived in the parking lot east of the Abuelo's Mexican Restaurant, located at 10909 East 71st Street Tulsa, Oklahoma. A short

time later, investigators established physical surveillance of the Chevrolet Malibu and observed it parked next to an orange Dodge Challenger, bearing Oklahoma tag KXL725. I observed a Hispanic male, wearing a white t-shirt and red pants at the trunk of the Chevrolet Malibu. The trunk of the Chevrolet Malibu was open and the Hispanic male removed the aforementioned gray tote from the trunk of the Malibu and carried it to the back of the orange Dodge Challenger. At the same time, the Chevrolet Malibu departed the location. Surveillance of the Chevrolet Malibu was terminated at that time.

56.   I observed the Hispanic male place the gray tote in the trunk of the orange Challenger. A registration check of Oklahoma tag KXL725 revealed the tag to be registered to an orange 2011 Dodge Challenger to Erika Romero at 1501 NW 8th Street, Oklahoma City, Oklahoma.

57.   At approximately 2:18 p.m., I observed the orange Challenger depart the Abuelo's parking lot and travel to the Texas Roadhouse parking lot, just east of the Abuelo's. The Hispanic male exited the driver's seat and walked up to and pulled on the doors to the Texas Roadhouse that appeared to be locked. The Hispanic male then entered back into the orange Challenger and traveled east through the parking lot and stopped at the east end of the shopping center parking lot for approximately one minute. At approximately 2:21 p.m., I observed the orange Challenger travel west through the parking lot and then westbound on 71st street. The orange Challenger failed to signal a lane change on 71st street east of Highway 169. The orange Challenger then traveled southbound on Highway 169.

58.   At approximately 2:28 p.m., Tulsa Police Department (TPD) Uniform Officers William Badgett, Ronni Lowman and Joel Burks conducted a probable cause traffic stop on the orange Challenger at approximately 9200 South Highway 169 southbound Tulsa, Oklahoma. Upon initial contact with the orange Challenger, TPD Officers identified the orange Challenger to be occupied by the Hispanic male driver, wearing the white shirt and red pants and a Hispanic female passenger. The Hispanic male was later identified as Elieser Blanco, and the female passenger identified as Adomaris Jimenez. The TPD Officers confirmed that neither of the occupants of the orange Challenger had a valid driver's license to operate a motor vehicle.

59.   The TPD Officers William Badgett, Ronni Lowman and Joel Burks had both occupants exit the orange Challenger, at which time, Blanco was arrested for driving without a driver's license. TFO Mike Helton, A/GS Taylor Wilson, and I responded to the scene of the traffic stop and conducted a search of the orange Challenger. We located the large gray tote in the trunk. Inside the gray tote were multiple large clear plastic Ziploc baggies that contained a crystal substance, suspected methamphetamine.

60.   A/GS Wilson and I took possession of the large gray tote containing the suspected methamphetamine and transported it to the TRO for processing and safekeeping. TFO Mike Helton conducted a field test of a sample of the crystal substance, which tested presumptive positive for methamphetamine. The gross

weight of the Ziploc baggies containing the suspected methamphetamine was 32,604.2 grams (approximately 32 kilograms).

**April 10, 2024**

    *A. The **white Dodge Challenger** is driven to the residence of Javier Rodarte*

61.  On April 10, 2024, while reviewing court authorized GPS location data on the **white Dodge Challenger**, affiant observed that at approximately 4:11 p.m., GPS location data for the **white Dodge Challenger** indicated it departed the apartment complex located at 5746 NW 16th Street, Oklahoma City, Oklahoma. The GPS location data indicated the **white Dodge Challenger** made a couple of stops before it then arrived within close proximity of 504 NE 19th Street in Moore, Oklahoma at approximately 6:05 p.m. During this investigation, investigators have identified 504 NE 19th Street, Moore, Oklahoma to be the residence of Javier Rodarte.

    *B. The **white Dodge Challenger** is driven to Leticia Garcia-Salazar's Apartment in Tulsa*

62.  At approximately 6:06 p.m., the GPS location data indicated the **white Dodge Challenger** departed 504 NE 19th Street, Moore, Oklahoma. At approximately 6:38 p.m., Affiant observed court authorized GPS location data on a **white Dodge Challenger bearing Oklahoma tag MCL420** to indicate the vehicle was travelling eastbound on the Turner Turnpike, towards Tulsa, Oklahoma, from Oklahoma City, Oklahoma.

63.  At approximately 7:45 p.m., A/GS Taylor Wilson established physical surveillance at Leticia Garcia-Salazar's residence, located at 7215 South 92nd East

Avenue, Apartment 2, Tulsa, Oklahoma. During this investigation, investigators

have previously observed Daisy Villanueva, in a **white Dodge Challenger**, to travel

to Garcia-Salazar's residence, located at 7215 South 92nd East Avenue, Apartment

2. At approximately 7:47 p.m., A/GS Wilson observed Garcia-Salazar return to her

residence, driving a black Chevrolet Impala bearing paper tag UD5695003693. Upon

arrival, A/GS Wilson observed Garcia-Salazar exit her vehicle wearing a tan

sweatshirt, dark colored pants, carrying a purse/bag across her body, and to be

talking on the telephone. Garcia-Salazar used a key to enter into Apartment 2.

64.    At approximately 7:52 p.m., A/GS Wilson observed a **white Dodge**

**Challenger** arrive and park in the front of Garcia-Salazar's apartment. Subsequently,

A/GS Wilson observed two females exit the **white Dodge Challenger** and approach

Garcia-Salazar's apartment. The two females waited at the door until they were let

into Garcia-Salazar's apartment. A/GS Wilson observed the first female to be

wearing dark colored pants, a dark gray t-shirt, to have long dark colored hair, and

appear to be carrying an unknown object in her left arm; and the second female to be

wearing dark colored pants, a dark colored sweatshirt, to have long dark colored

hair, and to be carrying a plastic bag.

*C.  Garcia-Salazar drove to meet with Ricardo Plateado*

65.    At approximately 8:00 p.m., A/GS Wilson observed Garcia-Salazar exit her

apartment and enter into her black Chevrolet Impala. Shortly thereafter, Garcia-

Salazar departed from the apartment complex. TFO Darin Zumwalt maintained

physical and electronic Garcia-Salazar in her black Chevrolet Impala and observed

her travel to the area of Raising Cane's, located at 10707 East 71st Street, Tulsa,

Oklahoma. TFO Zumwalt did not observed Garcia-Salazar meet with anybody or

exit her vehicle while located at Raising Cane's. At approximately 8:22 p.m., TFO

Zumwalt observed Garcia-Salazar leave from the area of Raising Cane's. TFO

Zumwalt observed Garcia-Salazar to drive to various locations near the 71st and

Garnett area before ultimately parking in the Target parking lot, located at 10711

East 71st Street, Tulsa, Oklahoma.

66.    At approximately 8:40 p.m., TFO Zumwalt observed a Hispanic male exit

Garcia-Salazar's black Chevrolet Malibu and enter into a gray 1997 Nissan truck

bearing Oklahoma tag MIU190 (which is registered to Ricardo Plateado at 708

North Kalanchoe Avenue, Broken Arrow, Oklahoma). During this investigation,

investigators have previously identified Ricardo Plateado-Martinez to deliver bulk

U.S. Currency to Urquiza-Urquiza. In addition, investigators have identified Garcia-

Salazar to be a methamphetamine distributor, including distributing approximately

32 kilograms on March 12, 2024.

*D. At the same time, the **white Dodge Challenger** was driven to a different meeting*

67.    Meanwhile, at approximately 8:20 p.m., A/GS Wilson observed the **white**

**Dodge Challenger** depart from Garcia-Salazar's apartment complex. A/GS Wilson

did not observe who entered into the driver's seat of the vehicle. A/GS Wilson

maintained physical and electronic surveillance on the **white Dodge Challenger** and

observed the vehicle arrive to Dollar General, located at 5000 North 37th Street,

Broken Arrow, Oklahoma at approximately 8:42 p.m. Approximately two minutes later, A/GS Wilson observed a female exit the front passenger seat of the **white Dodge Challenger** and get into a silver 2014 Acura sedan, bearing Oklahoma tag MGW726. A/GS Wilson was unable to make a positive identification of this female. Subsequently, the silver Acura sedan departed without anyone getting out from the Dollar General parking lot. A/GS Wilson observed the silver Acura sedan to travel southbound on North 37th Street (also known as South 209th East Avenue) and then turn westbound on East Vail Street into a neighborhood. A/GS Wilson did not follow the vehicle into the neighborhood.

**Daisy Villanueva's Texas Trip**

> A. The **Dodge Challenger** traveled to 5746 NW 16th Street Oklahoma City, Oklahoma and then drove to Houston, Texas

68.  After the meeting at the Dollar General at approximately 9:03 p.m., GPS location data indicated the **white Dodge Challenger** arrived back at 7215 South 92nd East Avenue where it stayed for a little less than two hours before leaving again.

69.  On April 11, 2024, at approximately 12:24 a.m., GPS location data for the **white Dodge Challenger** indicated it arrived at the OnCue, located at 3620 NW 39th Street Oklahoma City, Oklahoma. At approximately 12:34 a.m., GPS location data indicated the **white Dodge Challenger** departed the OnCue. At approximately 12:39 a.m., GPS location data indicated the **white Dodge Challenger** arrived at the McDonalds at U.S. 66 and North MacArthur Boulevard. At approximately 12:42

a.m., GPS location data indicated the **white Dodge Challenger** departed the

McDonalds. At approximately 12:45 a.m., the GPS location data indicated the

**white Dodge Challenger** arrived at the apartment complex containing 5746 NW 16th

Street Oklahoma City, Oklahoma.

70.    About 6 hours later, GPS location data indicated the **white Dodge**

**Challenger** departed 5746 NW 16th Street Oklahoma City, Oklahoma. Later that

afternoon, GPS location data indicated the **white Dodge Challenger** arrived in the

Houston, Texas area. While in Houston, Texas, the GPS location data indicated the

**white Dodge Challenger** made a couple of stops.

71.    After being in Houston for approximately two hours, GPS location data

indicated the **white Dodge Challenger** departed the Houston-area, traveling

northbound. On April 12, 2024, at approximately 1:23 a.m., GPS location data

indicated the **white Dodge Challenger** arrived at 5746 NW 16th Street Oklahoma

City, Oklahoma.

**Statement of belief for this trip**

72.    Based on my training and experience, and knowledge of this investigation, I

believe that on April 10, 2024, Daisy Villanueva traveled in the **white Dodge**

**Challenger** to Tulsa, Oklahoma to receive drug proceeds for the DTO and then

transported the drug proceeds to Oklahoma City, Oklahoma. Additionally, on April

11, 2023, I believe Daisy Villanueva traveled in the **white Dodge Challenger** to

Houston, Texas to deliver a bulk amount of drug proceeds to other members of the

DTO. Furthermore, I know based on my training, experience and knowledge of this investigation, that Houston, Texas is a source city for the DTO's supply of methamphetamine.

73.    Furthermore, GPS location data for telephone number 405-833-4853, suspected to be utilized by Daisy Villanueva traveled with the **white Dodge Challenger** on April 10, 2024, when the **Dodge Challenger** traveled to Tulsa, Oklahoma, as well as on April 11, 2024, when the **Dodge Challenger** traveled to Houston, Texas.

## Conclusion

74.    Based on the information above, I submit that there is probable cause to search **a White 2019 Dodge Challenger, Oklahoma tag MCL-420,** as further described in Attachment A, and seize the items described in Attachment B.

75.   I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully submitted,

Task Force Officer Anthony Finnegan
Drug Enforcement Administration

Subscribed and sworn to by phone on April 22, 2024.

SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## VEHICLE TO BE SEARCHED

**A white 2019 Dodge Challenger, Oklahoma tag MCL-420:** A records check reveals the **white Dodge Challenger** is registered to Daisy Villanueva at 5746 NW 16th Street, Oklahoma City, Oklahoma (VIN: 2C3CDZAG0KH532031).



## ATTACHMENT B

### Particular Things to be Seized

All items that constitute evidence, instrumentalities, contraband, and/or fruits of violations of Title 21, United States Code, Section 846 and 841(a) – Drug Conspiracy and Title 18, United States Code, Sections 1956 and/or 1957 – Laundering of Monetary Instruments, including:

1.      Documents showing ownership of real or personal property;

2.      United States Currency or items reflecting drug proceeds;

3.      Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data.

4.      Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

5.      Items of personal property tending to establish the existence of a narcotics

conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

6.    Paraphernalia for distributing, packaging and weighing narcotics. Equipment and materials used in the building or using concealed compartments;

7.    Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

8.    Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

9.    Records and items reflecting travel for the purpose of participation in drug trafficking including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

10.    Any and all appointment calendars;

11.    Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial transactions including the purchase of real estate and documents showing ownership of real estate;

12.    Records relating to employment, wages earned and paid and other

2

compensation records.  Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

13.  Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly:  financial records of withdrawals, funds of transfers, purchases, sales, transfers of assets or consolidation of assets.  Liquid assets orevidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

14.  Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

15.  Evidence contained within vehicles on the curtilage of any single-family dwelling to be searched;

16.  Cellular telephones including electronically stored data on said telephones or other electronic storage devices such as PDA's or electronic organizers,

17.  Electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon. Computers and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in files or disc, drives, in

3

memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device;

18.    Firearms, ammunition and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

19.    If any electronic storage device is seized during the search of the premises, a separate warrant will be sought before searching those storage devices for data.